UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

ARTHUR W. PRICE, JR.,              )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )          Case No. 2:12CV19 CDP
                                   )
CAROLYN W. COLVIN,[1]              )
Commissioner of Social Security,   )
                                   )
          Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Arthur Price's application for Disability

Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et

seq. and Supplemental Security Income (SSI) under Title XVI of the Act, 42

U.S.C. §§ 1381, et seq. Claimant Price brings this action asserting disability

because of a "mini-stroke," and a combination of mental and physical impairments

including migraine, hypertension, occluded left cartoid artery, cerebrovascular

accident (CVA), bipolar disorder, vascular dementia, adjustment disorder,

depression, and anti-social personality disorder.  The Administrative Law Judge

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  As such, she should be substituted for Michael J. Astrue as the defendant in this suit.  Fed. R. Civ. P. 25(d).

concluded that Price was not disabled.  Because I find that the decision denying

benefits was supported by substantial evidence, I will affirm the decision.

## Procedural History

Price filed for Disability Insurance benefits on April 7, 2010 and filed for

Supplemental Security Income on March 31, 2010, alleging disability as of

January 9, 2010.  The Social Security Administration denied his claims, and he

filed a request for a hearing by an Administrative Law Judge (ALJ) on October 26,

2010.  An ALJ held a hearing on August 1, 2011, at which Price testified. The ALJ

denied Price's claim on August 25, 2011.  On January 20, 2012 the Appeals

Council denied Price's request for review.  Thus, the decision of the ALJ thus

stands as the final determination of the Commissioner.

## Testimony Before the ALJ

At the time of the administrative hearing, Price was forty-six years old.  He

had obtained a GED and completed a year's training in technical drafting in

technical college.  His employment since 1995 has consisted primarily of laborer's

work at hog farms.

Price testified that as a result of his bipolar disorder, he felt depressed and

felt he could not do anything correctly for about two or three days a month even

when taking medication.  During manic episodes, he has difficulty sleeping and

has racing thoughts.

Price also stated his anger issues cause him to black out.  These black outs might not occur for months or they could occur several times a week, and Price said they were often triggered by the "stupidity" of others.  Anger issues and arguments frequently occurred with co-workers and supervisors, and that's how he get fired from most of his jobs.  Also, crowds of people make him anxious, but he did not usually have anxiety attacks when alone.

Price reported having migraines at least once every two to three months that cause him to stay at home, and that he had to go to hospital every three to four months because of severe migraines that lasted four to six hours on average.  He takes the medication Fioricet, and if that doesn't work he takes Tizanidine, which usually makes it go away, but if it doesn't go away with Tizanidine, he goes to the emergency room.  Nothing in particular brings it on, but once it seemed as though the heat brought it on.

Price reported  that a defect in his left internal carotid artery causes shortness of breath when he tries to do anything physical, and it causes lightheadedness, dizziness, and feeling faint.  He also stated that he had knee problems, but that his knee was doing fine after knee surgery in June, 2011.

Price lives in a mobile home with his girlfriend, their son, and his

girlfriend's three older children.  He reported that he doesn't do any type of housework or cooking, but does prepare lunch sandwiches for himself and for his son.  On an average day, he and his son watch a lot of TV.  He stated he could not do anything that required physical exertion, even walking to the park as the heat bothers him too much.  He leaves his house about three to four times a week, usually to his mother-in-law's house, but doesn't have many friends in the area to visit.

The ALJ also heard testimony from a vocational expert.  The ALJ posed a hypothetical question to the vocational expert, asking him to consider an individual of Price's age, education and work experience, but  limiting occupations of the hypothetical claimant to those not requiring more than occasional postural maneuvers; no exposure to dangerous machinery and unprotected heights; limited to only simple, routine, repetitive tasks not performed in a fast-paced production environment involving only simple decisions and few workplace changes; light work; and only occasional interaction with supervisors, coworkers, and the general public.  The vocational expert testified that such an individual would not be able to engage in any of Price's past work as a farm worker, quarry worker, or warehouse laborer, and that there would be no transferability of skills.  The expert testified that the hypothetical individual could

work as a cleaner/housekeeper, bench assembly worker, or work doing inspection and hand packaging.  He stated  there were approximately 6,500 jobs for cleaner/housekeeper in Missouri and 325,000 nationally, 2,500 jobs for bench assembly worker in Missouri and 125,000 nationally, and 2,500 jobs for the inspection/hand packing work in Missouri and 125,000 nationally.

The vocational expert further testified that employers would tolerate 1.8 to 2 days a month of leave or sick time, but that any absence beyond that would subject the worker to dismissal and termination.  The worker would be limited to no more than 10 or 15 minute breaks every two hours of work and a 30 minute lunch period, and would need to be on task 85 to 90 percent of the time.  Exceeding any of these limits on a regular basis would eliminate all competitive employment.

**Medical Records**

Price was admitted to Audrain Medical Center on January 9, 2010, the date Price claims his disability from a "mini-stroke" began.  Price complained of a severe headache with left side numbness and tingling that began while he was using a power washer that morning.  A CAT scan of the brain showed no evidence of hemorrhage, and results of a spinal tap were unremarkable.  He was treated for presumed complex migraine with Imitrex, but still had recurrence of his headache

and side effects from the Imitrex, and he requested to be transferred to University Hospital.

On January 10, 2010, Price was transferred to University Hospital.  His MRI showed occlusion in left internal carotid artery (LICA),  "dropout in left carotid, concerning for dissection, and possible aneurysm."  Further tests, a catheter angiography, ruled out left carotid artery dissection and was suggestive of a "congenital anomaly, with good collateralized circulation."  His EEG was normal. His headache and dizziness improved over the course of his hospital stay.  He was discharged on January 13, 2010, with a discharge diagnosis of "headache."  He was to follow up with his primary care provider, Dr. Kondro,  in 2 months, and with neurology in 2-3 months.

On January 19, 2010, Price reported to Dr. Kondro that he had a severe headache lasting many days.  On February 10, 2010, Price reported to Dr. Kondro an "uncomfortable feeling in his chest and belly," but that his headaches seemed improved and he was not dizzy.   On March 3, 2010, Price again reported headaches; Dr. Kondro reported that a CT scan was "essentially ok."

On March 17, 2010, Price was seen at Mason Eye Institute by the Director of Neuro-Opthamology Service, Dr. Johnson.  Dr. Johnson reported the episode of syncope (on January 10, 2010) and continuous headache as well as decreased

vision after the episode.  Dr. Johnson stated he was uncertain why Price had headaches, noting his MRI scan, lumbar puncture, and cardiac evaluation were all normal.  Dr. Johnson reported that the neuro-opthalmologic examination documented presbyopia, for which over-the-counter reading spectacles were recommended.  He also noted there was no cataract, intraocular infection, or inflammation observed.

On March 23, 2010, Price was seen at the Neurology Clinic to follow up on his headaches.  His diagnosis included migraine and LICA occlusion.  It was recommended that his medications be adjusted and monitored, and for the LICA occlusion that he be given aspirin and that his risk factors be monitored.  The report also stated that repeating a CT angiogram may be considered in 6 months.

On March 31 and again on April 27, 2010, Price reported pain in his chest to Dr. Kondro.  On May 17, 2010, Price reported poor sleep and high anxiety to Dr. Kondro. On July 20, 2010, Price reported a migraine after heat exposure.  On September 20, 2010, October 1, 2010, November 4, 2010, and November 30, 2010, Price was seen be Dr. Kondro for headache, left arm tingling, depression and anxiety.  The staff noted that Toradol injections were repeatedly effective in controlling his headaches.

On April 20, 2010, a brain MRI was performed at Audrain Medical Center.

The report indicated "no focal areas of abnormal signal of significance are identified in the brain."  The report also indicated an "asymmetry in the carotid siphons," which would correspond to findings on the previous CT scan.

Price was admitted to University Hospital on January 11, 2011, because of weakness and dizziness.   He also reported headaches and vertigo with no loss of consciousness but some tiredness and lethargy.  By January 12, 2011, his symptoms resolved.  He underwent a brain MRI, which showed no evidence of acute stroke, and it was thought he might have had a simple partial seizure, although he was on medication for seizure.

Price was seen at Audrain Medical Center emergency room on July 21, 2011, for acute migraine headaches and was given Toradol.  He was reassessed later in the day, reporting 95% relief and almost no pain, and was discharged.

On December 21, 2010, December 30, 2010, February 17, 2011, Price was seen by Dr. Cramp for elbow and knee injuries.  His knee injury was assessed to likely be ACL tear.  Price reported his  pain improved with medication.  Price was given x-rays of his right elbow at the Orthopedic Clinic on February 28, 2011, which revealed a small spur, and he was given steroid injections.  On April 25, 2011, and May 23, 2011, he reported his right elbow pain and knee pain was better.  On June 2, 2011, Price underwent left knee arthroscopy.  Price went to the

- 8 -

Audrain Medical Center emergency room on June 9, 2011, because of pain from the knee surgery and problems with his medication, causing hallucinations and sleeping difficulty.  His medication was adjusted.   He had a follow-up at the Orthopedic Clinic June 16, 2011, and his postoperative medication was further adjusted.

On September 14, 2010, Price was seen by Patrick Finder, Licensed Psychologist, for a psychological evaluation, at the request of the Missouri Department of Elementary and Secondary Education, Section of Disability Determinations.   Finder reported that Price "does seem to be experiencing dementia due to his multiple strokes" and found a diagnosis of vascular dementia, adjustment disorder, and polysubstance abuse in remission.  Price reported to Finder a history of small strokes, migraine headaches, shattered kneecap, as well as severe restrictions in daily activities.  Finder reported that Price's ability to understand instructions remains intact, but that he reported severe memory problems and little ability to concentrate.

On September 21, 2010, Dr. Barbara Markway performed a mental residual functional capacity assessment and a psychiatric review of Price's records from January 9, 2010  to September 21, 2010.  Dr. Markway indicated that Price's allegations are partially credible, but severity of problems is likely overstated, and

noted that Finder's diagnosis of vascular dementia was based largely on the
claimant's self-report of memory problems from his "mini-strokes" and that the
examiner, Finder, did not have benefit of all the medical records.  Dr. Markway
summarized Price's Understanding and Memory, Sustained Concentration and
Persistence, Social Interaction and Adaptation as either "moderately limited" or
"not significantly limited," but not "markedly limited."

On December 2, 2010, Price was brought to the St. Joseph Health Center
emergency room by emergency medical services staff called by police after he
threatened to drive his car through Dr. Kondro's office because he was not able to
get into the doctors office to get something for his pain.  While in the emergency
room, Price became violent and threatened medical staff.  He was admitted
because of "unsafe and disruptive behavior" and reported recurrent headache and a
mini-stroke in January, 2010.   He denied being suicidal or homicidal at the time.
It was reported Price has no history of prominent manic symptoms, but previous
history of chronic anxiety symptoms; that he has no memory impairment and no
general cognitive impairment, but impaired impulse control. He was diagnosed
with intermittent explosive disorder, marijuana abuse, and antisocial personality
disorder, and was given a number of medications to address his symptoms.  He
reported smoking marijuana on December 2, 2010.  On December 4, 2010, Price's

mood was reported better though he gets angry at times.  A medical consultation of physical condition noted headache, most likely stress-induced, and his medications were adjusted.  He was discharged December 7, 2010.

On December 3, 2010, Price was notified he would no longer be seen at the Wellsville Clinic of Audrain Medical Center, because of non-compliance with treatment plan, missed appointments, failure to meet financial obligations and abusive language and behavior directive at staff and/or other patients.

On December 8, 2010, Price was seen at Evergreen Behavioral Services for an intake assessment, which indicated anxiety, fair memory and cognition, and poor concentration, average intellectual functioning, and appropriate orientation. Price reported problems with anger and recent drug use.  On December 17, 2010, Price was seen by Brenda Carter, LPC, where Price reported he was sleeping a lot and smoking pot to self-medicate, and on December 29, 2010, he reported smoking pot daily.  On January 14, 2011, January 21, 2011, January 26, 2011, February 9, 2011, and February 23, 2011, he continued discussing anger problems, but liked the changes he was making in his life and was handling things differently.  Ways he could have a positive impact on the children in the house were discussed.  Carter saw Price four times in March, 2011, twice in April, 2011, three times in May, 2011, and on July 5, 2011 focusing on Price's anger issues,

regular pot smoking, and general life improvements.

On December 23, 2010, Price was seen at the Arthur Center for psychiatric evaluation, and was given a diagnosis of bipolar disorder, cannabis dependence, and antisocial disorder. On January 27, 2011, March 10, 2011, and April 21, 2011, Price was seen by Arthur Center Nurse Pracitioner Andrea Earlywine, who reviewed his medication.  Price became agitated on April 21, 2011, when Earlywine refused to refill a medication because of its habit-forming nature and Price's history of drug abuse.

Price was admitted to St. Joseph Health Center on March 5, 2011, because of increased depression.  He exhibited agitation and expressed suicidal ideation, but no suicidal plans. Medication was adjusted and Price was involved in daily treatment groups.  He denied any complaints except for knee pain, which was getting better.  He reported to Dr. Marapareddigari that he used marijuana regularly.  He denied drug use to Dr. Murali, but urine tox screen showed marijuana.  His mood improved and he was discharged on March 8, 2011.  His discharge diagnoses included bipolar affective disorder and marijuana abuse.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v.*

- 12 -

*Apfel*, 242 F.3d 793, 796 (8th Cir.2001). Substantial evidence in a social security case is less than a preponderance, but it is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir.2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir.2000) (quoting *Warburton v. Apfel*, 188 F .3d 1047, 1050 (8th Cir.1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the claimant's education, background, work history, and age;

(3) the medical evidence from treating and consulting physicians;

(4) the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir.1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 13 82c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. If the claimant has a severe impairment, the Commissioner evaluates whether the

impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir.1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g.*, *Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir.1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), which include claimant's prior

work record, and observations by third parties and treating and examining physicians relating to such matters as:

    1. the claimant's daily activities;

    2. the duration, frequency, and intensity of the pain;

    3. precipitating and aggravating factors;

    4. dosage, effectiveness, and side effects of medication;

    5. functional restrictions.

*Id.* at 1322.   When an ALJ explicitly finds the claimant's testimony is not credible and gives good reasons for the findings, the court usually defers to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir.2007).

### The ALJ's Findings

The ALJ found that Price was not disabled within the meaning of the Social Security Act from January 9, 2010 through the date of the decision. He issued the following specific findings:

    1. Price met the insured status requirements of the Social Security Act through June 30, 2011.

    2. Price has not engaged in substantial gainful activity since January 9, 2010, the alleged onset date of disability (20 C.F.R. §§ 404.1571 et. seq., and 416.971 et seq.).

    3. Price has the following severe impairments: bipolar disorder, adjustment disorder, and anti-social disorder (20 C.F.R. §§ 404.152(c) and 416.920©).

- 16 -

4. Price does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. Price has the residual functional capacity to perform light work as defined in 20 C.F.R. § § 404.1567(b) and 416.967(b) as lifting 20 pounds occasionally, 10 pounds frequently, and standing or walking up to 6 hours in an 8 hour work day) except that he is limited to occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing.  He is limited to occupations that do not involve exposure to dangerous machinery and unprotected heights.  The claimant is restricted to simple routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes.  In addition, he is restricted to occasional interaction with supervisors, coworkers, and the general public.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416. 965).

7. The claimant was born on June 27, 1965 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date of January 9, 2010  (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

**Discussion**

When reviewing the denial of Social Security benefits, a court must determine whether there is substantial evidence on the record to support the ALJ's decision. 42 U.S.C. 405(g).  On appeal, Price raises three points of error.  First, Price claims that the ALJ's failure to find Price's migraine headaches a severe impairment was in error.  Second, Price argues that the ALJ failed to pose a complete hypothetical question to the vocational expert and did not consider all the functional limitations causing Price's mental and physical impairments when assessing residual functional capacity (RFC).  Finally, Price claims that the hearing decision improperly analyzes Price's credibility.

**1.  Migraine Headaches**

The first claimed error is that the ALJ failed to find Price's migraine headaches to be a severe impairment.  At step two of the sequential evaluation process, an ALJ determines the medical severity of a claimant's impairments. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404 .1520(c). "The impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical ... impairment

must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir.2011) (quoting 20 C.F.R. § 404.1508). Although Price has "the burden of showing a severe impairment that significantly limited her physical or mental ability to perform basic work activities, ... the burden of a claimant at this stage of the analysis is not great." *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir.2001). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir.2007) (internal quotation marks and citations omitted).

Here, the ALJ acknowledged that Price's medically determinable impairments could reasonably be expected to cause migraine headaches. However, the ALJ found the migraine headaches to be nonsevere because the severity was unsupported by objective medical findings.

 Price was hospitalized for headaches or migraine on January 9, 2010, January 11, 2011, and July 21, 2011, and was diagnosed with migraine by numerous physicians.  He was treated fairly regularly from January to November, 2010, for headache by his primary care physician, Dr. Kondro.  The January 9,

2010 hospitalization was extended because of extensive testing.  CAT scan, spinal tap, catheter angiography, and EEG were normal.  An MRI revealed some concern that was later reviewed.  Price was discharged with a diagnosis of headache, though Price repeatedly refers to this episode as a "mini-stroke."  On March 17, 2010, Dr. Johnson, Director of Neuro-Opthamology Service, said he was uncertain why Price had headaches, noting his medical tests were all normal.  On March 23, doctors at the Neurology Clinic recommended adjusting medications, that he be given aspirin, and be monitored.  A follow up MRI on April 20, 2010, revealed no significant abnormalities.  Staff at Dr. Kondro's office reported that Toradol injections were repeatedly effective in treating Price's headaches.  Price was hospitalized because of reported headache on January 11, 2011, but discharged the following day when a brain MRI was normal and his symptoms resolved.  Price went to the emergency room on July 21, 2011, was given Toradol injections, and was discharged the same day.

At the hearing, Price reported having migraines every two to three months that would cause him to stay home, which he treated with his medication.  The vocational expert at the hearing testified that an employer would tolerate 1.8 to 2 days of missed work a month.

The ALJ's determination that Price's migraine headaches were nonsevere is

- 20 -

supported by substantial evidence on the record as a whole.  Here, the ALJ made

the determination that Price's migraine was a medically determinable impairment,

but would have no more than a minimal impact on Price's ability to work.  The

medical record does not provide diagnostic testing that could reasonably be

expected to support a severe impairment.  *See Martise*, 641 F.3d at 924

Additionally, Price's migraine headaches respond well to treatment.  *See Id.*

("Because [claimant's] migraine headaches are controllable and amenable to

treatment, they 'do not support a finding of disability.'")  Finally, even if Price

was required to stay home from work once every two to three months due to

migraine headaches as he claims, he would still be well within the 1.8 to 2 days a

month of missed work tolerable to most employers according to the vocational

expert, and he would not be precluded from employment.

**2.  ALJ's Hypothetical Question**

Price contends that the  ALJ failed to pose a complete hypothetical question

to the vocational expert as he did not include Price's severe migraines, problems

with memory, concentration and following instructions in formulating Price's

residual functional capacity.   "While it is clear that 'questions posed to vocational

experts ... should precisely set out the claim's particular physical and mental

impairments,' a proper hypothetical question 'is sufficient if it sets forth the

- 21 -

impairments which are accepted as true by the ALJ.'" *House v. Shalala*, 34 F.3d

691,694 (8th Cir.1994). Thus, "[a] hypothetical question ... need only include

impairments that are supported by the record and which the ALJ accepts as valid."

*McKinney v. Apfel*, 228 F.3d 860, 865 (8th Cir.2000).

 The ALJ's hypothetical question addresses concerns with memory and

following instruction by limiting work to only simple, routine, repetitive tasks not

performed in a fast-paced production environment involving only simple

decisions, few workplace changes  and with only occasional interaction with

supervisors and coworkers.  Furthermore, allegations of Price's severe memory

problems are primarily self-reported.  As discussed in the following section, the

ALJ found Price's subjective allegations often lacked credibility or were

overstated.   The medical record provides substantial evidence of at least fair

memory and ability to follow instruction.   Price's migraine headaches, as

discussed in the previous section, did not preclude employment.

 The ALJ properly posed a hypothetical to the vocational expert and

adequately considered the effect of all of the claimant's impairments that the ALJ

found credible.

## 3.  Analysis of Claimant's Credibility

 Price argues that the hearing decision improperly analyzes Price's

credibility in reference to his capacity to work.  In his daily living activities, Price states that he attempts to take care of his child, but often sits and watches TV and cannot do anything requiring physical activity, and also reported to a doctor that he was unable to care for his child when he was angry.  Price further states that he often gets assistance from friends and family members in daily activities.  Price contends that the daily activities noted by the ALJ that Price performs, such as child care and personal hygiene, do not support a finding that he can perform work on a sustained basis, and Price argues that the ALJ's assessment of Price's credibility was unfair.

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir.2009) (quoting *Holmostrom v. Massanari*, 270 F.3d 715, 721 (8th Cir.2001)). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir.2011).

The ALJ noted that other evidence indicated Price was not as limited as he alleged.  Previous reports on the record indicated that Price was able to perform personal care and basic chores like shopping, as well as basic child care.  The ALJ did not rely solely on these activities to find that Price could perform work on a

- 23 -

sustained basis.  Rather, the ALJ concluded that Price was not as limited as he alleged because of other evidence in the record.

The ALJ  noted that Price had made inconsistent statements regarding matters relevant to the issue of disability.  In March, 2011, at St. Joseph Health Center, Price reported to one doctor that he used marijuana regularly and denied marijuana use to another doctor, though a urine screen showed marijuana use.  At different times in the record, Price denied marijuana use and at other times, admitted to daily marijuana use.   Additionally, Price repeatedly reported to medical personnel that he had a "mini-stroke" in January, 2010, though there was no medical evidence to support stroke.  His report of  "mini-stroke" to a consultative psychologist, who did not have access to the medical record, led the psychologist to note that Price seemed to experience "dementia due to his multiple strokes," though there is no evidence of any strokes on the record.

The ALJ properly considered Price's statements and made credibility determinations that are supported by substantial evidence in the record.

## Conclusion

Based on my review of the record as a whole, for the reasons discussed above, I find that the decision denying benefits was supported by substantial evidence, and I will affirm the ALJ's decision.

- 24 -

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner
denying benefits is affirmed.

A separate Judgment in accord with this Memorandum and Order is entered
this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 29th day of July, 2013.